Charles L. PRINGLE, Plaintiff–
Respondent,

v.

**STATE HIGHWAY COMMISSION OF
MISSOURI, Defendant–Appellant.**

No. 17431.

Missouri Court of Appeals,
Southern District.
Division Two.

May 11, 1992.

Motion for Rehearing or to Transfer
Denied June 2, 1992.

Application to Transfer Denied
July 21, 1992.

David W. Ansley, Michael P. Mergen, Hall, Ansley, Carmichael & Gardner, Donald E. Meyer, Springfield, for defendant-appellant.

Cynthia O. MacPherson, Mountain Grove, for plaintiff-respondent.

FLANIGAN, Chief Judge.

Plaintiff Charles Pringle brought this action against defendant State Highway Commission of Missouri[1] for personal injuries and damages allegedly sustained by plaintiff as a result of a collision which occurred on August 30, 1988, in Howell County. The collision involved a 1974 Chevrolet Nova operated by plaintiff, and a 1984 Chevrolet 70 truck owned by defendant. The collision occurred on Route AP, a bituminous two-lane highway running generally north and south.

Prior to the collision, plaintiff was driving his vehicle south in the right hand or southbound lane. Defendant's truck, an "oil distributor" used for highway maintenance, was in a stopped position in the southbound lane. Defendant's employee, John Colbert, had parked it there, preparatory to setting out warning signs for an area where maintenance work was to be done. The collision occurred shortly before noon on a sunny day.

The petition alleged, among other things, that defendant's truck was left unattended and was blocking the entire southbound lane. Defendant's answer pleaded negligence on the part of plaintiff, and contributory fault. Defendant also filed a counterclaim and sought recovery for damage to the truck.

The jury returned a verdict, assessing a percentage of fault of 50 percent to defendant, assessing a percentage of fault of 50 percent to plaintiff, assessing plaintiff's total damages, without regard to fault, at $66,000, and assessing defendant's damages, without regard to fault, at $2,000. Defendant appeals.

Defendant contends that the trial court erred in giving, at plaintiff's request and over defendant's objection, Instruction 10, plaintiff's verdict-director, submitting plaintiff's claim for damages. The instruction reads:

## INSTRUCTION NO. 10

In your verdict you must assess a percentage of fault to Defendant Missouri State Highway Commission, if you believe:

First, either:

Driver John Colbert failed to keep a careful lookout, or

Driver John Colbert stopped his truck in a lane reserved for moving traffic, or

Driver John Colbert failed to use proper warning devices on his vehicle, or

Driver John Colbert failed to place warning or caution signs in the roadway or provide a flagman which would have warned Plaintiff Charles Pringle of the blocked lane of travel ahead, and

Second, Driver John Colbert was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to Plaintiff Charles Pringle.

In assessing any such percentage of fault against Defendant Missouri State Highway Commission, you must consider the fault of driver John Colbert as the fault of Defendant Missouri State Highway Commission.

It is defendant's position that the evidence is insufficient to support the first assignment of negligence, "Defendant John Colbert failed to keep a careful lookout," and paragraphs Second and Third of Instruction 10, dealing with the lookout assignment. For the reasons which follow, this court sustains defendant's contention, reverses the judgment, and remands the

---

1. The correct name of defendant is "State Highways and Transportation Commission," § 226.-020, RSMo 1986. Neither side complains about the fact that the petition used an incorrect name.

cause for a new trial on all issues. This disposition makes it unnecessary to consider other contentions raised by defendant.

■ Where, as here, a verdict-directing instruction submits in the disjunctive two or more assignments of negligence, the instruction is erroneous unless the evidence is sufficient to support all of the assignments. *Bunch v. McMillian,* 568 S.W.2d 809, 811[1] (Mo.App.1978); *Shelton v. Bruner,* 449 S.W.2d 673, 676 (Mo.App. 1969). A plaintiff is entitled to the benefit of the most favorable combination of facts which reasonably may be inferred from all of the evidence so long as such facts do not conflict with plaintiff's basic theory of the case or with his own judicial admissions. *Bunch, supra,* at 811[2]; *Williams v. Christian,* 520 S.W.2d 139, 141[3] (Mo.App. 1974). Plaintiff had the burden of showing a causal connection between the submitted negligence, failure to keep a lookout, and the injury sustained, and if the evidence leaves "the element of causal connection in the nebulous twilight of speculation, conjecture and surmise," *Shelton, supra,* at 680, the burden was not met and the judgment cannot stand.

■ Negligence consisting of a driver's failure to keep a careful lookout is not to be submitted to the jury unless there is substantial evidence from which the jury could find that the driver, in the exercise of the highest degree of care to keep a careful lookout, could have seen the other vehicle or person in time thereafter to have taken "effective precautionary action." *Heberer v. Duncan,* 449 S.W.2d 561, 563[3] (Mo. banc 1970). A lookout instruction submits failure to see *and* failure to avoid injury by any means supported by the evidence. *Lovelace v. Reed,* 486 S.W.2d 417, 419 (Mo. 1972). Although a lookout instruction need not hypothesize the means by which the driver, charged with failing to keep a careful lookout, could have avoided the collision, the evidence must support a finding that he possessed and failed to use such means. *Lovelace, supra. Miller v. St. Louis Public Service Co.,* 389 S.W.2d 769, 772[3, 4] (Mo.1965).

"Having the means and ability to avoid a collision means not only the mechanical appliances, such as steering apparatus with which to swerve, signalling equipment with which to warn, or braking appliances with which to slow down or stop, but also the existence of sufficient time and distance, considering the movements and speeds of the vehicles, to enable the party charged [with failure to keep a careful lookout] to take effective action in avoidance." *Zalle v. Underwood,* 372 S.W.2d 98, 102[2] (Mo. 1963).

■ The duty to keep a careful lookout and the concomitant duty to take effective precautionary action do not arise at precisely the same moment. *Thomas v. Wade,* 361 S.W.2d 671, 674 (Mo.banc 1962); *Hawkins v. Whittenberg,* 587 S.W.2d 358, 362[8] (Mo.App.1979); *Graham v. Conner,* 412 S.W.2d 193, 202 (Mo.App.1967). "[T]he duty to act when one does or should see arises at the time that a person, in the exercise of the highest degree of care, knew or should have known that there was danger, that is, a likelihood of injury." *Thomas v. Wade, supra,* 361 S.W.2d at 674. See also *Foster v. Farmers Insurance Co., Inc.,* 775 S.W.2d 143, 144[2] (Mo. banc 1989). "A failure to keep a lookout submission contains two inherent components, the ability to see and the ability, including time and means, to avoid. It is plaintiff's burden to supply substantial evidence of both components." *Bell v. United Parcel Services,* 724 S.W.2d 682, 685 (Mo.App.1987) (citing authorities).

■ The only eyewitnesses to the collision itself were plaintiff Pringle and defense witness John Colbert who was defendant's employee. Plaintiff was driving his car south in the right hand lane of Route AP. His speed, prior to the application of his brakes, was between 50 and 55 miles per hour. Plaintiff testified that there was a "straight stretch" of road approximately 1,000 feet in length which, for a southbound vehicle, commenced at a point 1,000 feet north of the point of collision.

Plaintiff testified: "It was a nice warm sunny day; I first saw the highway truck 200 feet away; I saw no warning signs or

flagmen; after I saw the truck I made as fast as possible contact with the brake and turned the steering wheel; it didn't seem to make any effect on it; the right front of my car struck the left rear of the truck; after I hit the truck, I was in a state of shock for a few seconds; I sat there and realized what had happened; I got hold of the door; I couldn't get out of the car so I had the window down and I climbed out the window on the driver's side; before I hit the truck I did not see anybody walking outside the truck; the first time I saw John Colbert was when I got out of my car and walked toward the front of the truck; I don't know where he was coming from; I know he jumped out of his truck with a rag he got on the dash or under the seat; I was bleeding pretty bad and he wrapped it around me and told me to go over into the ditch and sit down. I told Sgt. Selvey (the investigating officer) that possibly the sun obscured my vision."

Plaintiff testified that Route AP has no shoulders, that he laid down 67 feet of skid marks, and that the sight distance is 1,000 feet to the curve north of the scene of the collision.

The parties stipulated that the total stopping distance, including reaction time and braking distance, of a vehicle traveling 50 miles per hour, is 174 feet. The parties also stipulated that for a vehicle traveling 55 miles per hour the total stopping distance is 205 feet.

Plaintiff introduced the testimony of Karsten Kargill, a member of the maintenance crew. His testimony, on direct examination by plaintiff's counsel, included the following:

Q. Okay. When you approached the accident scene prior to seeing the flag man with the slow and stop paddle, did you see any road signs that you—

A. There was one sign up which had— John had set up, the first one.

Q. What did it say?

A. That was a road work sign.

Q. And the—was one-lane—did you see the one-lane road sign?

A. That's the first sign you set. He was setting the first sign.

Q. *Your estimation from what you saw was he was setting the first sign when the accident occurred?*

A. *Right.*

John Colbert testified that he parked the truck in the southbound lane. He testified: I was giving the southbound lane traffic a sight distance of 1,000 feet; before I got out of the truck, I had my flashing lights on and walked out to the back of the truck and looked down the road to make sure no one was coming; I took a sign, reading, "Road Work Ahead," off the back of the truck and walked north; I did not see Pringle's car until I was walking with the sign.... I was 40 or 50 feet north of the truck, walking north carrying the sign, when I first saw Pringle's car; it was close; I estimated his speed at 50 miles per hour; my first thought was my own safety; I was scared he was going to run over me but he didn't; his vehicle swerved a little; the right hand center of his vehicle struck the left corner of the truck.

Colbert testified that there was a logging road just south of the scene. He said he did not park the truck in the logging road because the truck was top heavy and "liable to get stuck or turned over by pulling off on one of those roads." He also said that if he had parked in the logging road, "I would have to pull out there and swing out into traffic to block traffic. I was concerned about traffic coming north." He said the logging road was about .1 of a mile south of the point of collision "but it's on a curve."

In challenging the lookout portion of Instruction 10, defendant argues that plaintiff introduced no evidence as to when Colbert saw or could have seen plaintiff's vehicle and that the only testimony on this matter came from Colbert, who said that he saw plaintiff's vehicle as he was walking north on Route AP to place the warning sign and that he was 35 to 50 feet from defendant's truck when he first saw plaintiff's car. Defendant argues that plaintiff introduced no evidence "either to show when the defendant saw or should have

seen the plaintiff's car or to show that at that time defendant could have avoided the collision by means which he possessed but failed to use." Defendant's brief also says:

The only evidence on this issue shows that it was physically impossible for John Colbert to have avoided the collision at the time he first saw plaintiff's vehicle. John Colbert testified that he was walking 35 to 50 feet behind the distributor truck when he first saw Charles Pringle's vehicle traveling 50 miles per hour past him. At that time, it would have been physically impossible for Mr. Colbert to have avoided the collision.

Seeking to uphold the lookout submission in Instruction 10, plaintiff argues:

In its brief, defendant makes extensive reference to the testimony of John Colbert to the effect that at the time that Mr. Pringle's car collided with the back of the state oil distributor truck, Mr. Colbert was some thirty-five to fifty feet behind the distributor walking north. This however, was not plaintiff's evidence. Mr. Pringle testified that prior to the collision he saw no one behind the truck and that the first time he saw Mr. Colbert, Mr. Colbert was jumping out of the truck with a rag which he had gotten from under the dash or under the seat. The clear inference here is that defendant's agent remained inside the truck up to and during the time of the collision. Mr. Colbert testified that, when he stopped his truck, he believed he was getting southbound traffic a sight distance of 1,000 feet. The reasonable inference to be drawn here is that Mr. Colbert through the mirrors located high up on his two ton truck could see traffic 1,000 feet to the north of his position and by keeping a careful lookout, could have moved his parked truck out of the roadway upon seeing plaintiff approaching.

Finally, plaintiff and his father testified that there was a logging road less than one-tenth of a mile south of where John Colbert parked his oil distributor truck and that it would have been possible to pull the oil truck onto that logging road. The further inference here is that Mr. Colbert had the means to pull the oil distributor truck out of the path of Mr. Pringle's car once he was aware or should have been aware of the danger had he been keeping a careful lookout.

A vehicle traveling 50 miles per hour is traveling 73.33 feet per second. The parties generally agree that defendant's truck was visible to plaintiff when he was at a point 1,000 feet north of the rear of the truck. If plaintiff had not reduced his speed, he would have traversed the 1,000 feet in 13.6 seconds. He did apply his brakes after he saw the truck when he was 200 feet north of the rear of the truck. He did traverse the 800 feet, measured from the north end of the straight stretch to the point where he first saw the truck, in 10.9 seconds.

■ The authorities previously cited hold that Colbert's duty to keep a careful lookout and the concomitant duty to take effective precautionary action do not arise at precisely the same moment. The duty to act arose when Colbert knew or should have known that there was a likelihood of injury. The duty to act arose at some time, to be determined by the jury, but no earlier than 13.6 seconds before the impact.

Where was Colbert and what was he doing during those few seconds immediately preceding the impact? Plaintiff's argument is that Colbert was not 40 or 50 feet north of the truck and walking north carrying the sign, which was Colbert's testimony. Plaintiff makes no attempt to justify the lookout submission by arguing what means were available to Colbert and what steps he could have taken if he was walking in the roadway. Perhaps plaintiff makes no such attempt because he testified he never saw Colbert prior to the impact so any warning from Colbert would not have enabled plaintiff to have avoided the collision.

Plaintiff argues that the record supports the inference that Colbert was inside the truck while plaintiff's vehicle was approaching. Plaintiff never saw Colbert prior to the collision. Plaintiff did testify that he did not see anyone walking outside the truck as he approached it. Plaintiff did not

see Colbert at all until after the collision had occurred and until after plaintiff sat in a state of shock for a few seconds and then climbed out the window of his car.

The only basis for plaintiff's argument that Colbert was inside the truck during plaintiff's approach is that Colbert had driven the truck to its stopped position, and plaintiff, during his approach, did not see him out of it. Plaintiff contends the reasonable inference is that Colbert was still in it. On this record there are difficulties with that inference.

In *Missouri Power & Light Co. v. City of Bucklin,* 163 S.W.2d 561, 564 (Mo.1942), the court said: "A general rule of presumptions is that, where the existence at one time of a certain condition or state of things of a continuing nature is shown, the presumption arises that such condition or state continues to exist *until the contrary is shown.*" (Emphasis added.) Plaintiff's evidence, through the testimony of Karsten Kargill, was that Colbert "was setting out the first sign when the accident occurred." That testimony is inconsistent with the inference that Colbert was inside the truck during plaintiff's approach. The petition pleaded that defendant's truck was left unattended.

If it is assumed, arguendo, that Colbert was inside the truck during the few seconds which transpired during plaintiff's approach, the record is insufficient to support the lookout submission. Plaintiff argues that Colbert could have seen the approach of plaintiff's vehicle by using the rear view mirror on the truck. There was no evidence that the mirror or mirrors on the truck were so positioned that Colbert, if inside the truck, could have seen plaintiff's vehicle throughout the entire 1,000 feet of the straight stretch or only a portion of that stretch. If the view was only of a portion, there was no showing which portion that was.

Even if Colbert could have seen the approach of plaintiff's vehicle at the time when Colbert's duty to act arose, there was no showing what Colbert could have done to have avoided the accident. There was no evidence that the horn on the truck was in working order or that, if it was, a honk by Colbert would have enabled plaintiff to have missed the stopped truck.

Plaintiff's argument is that the thing which Colbert could have done, and failed to do, was to move the truck off the highway onto the logging road. There was no evidence that such a movement could have been made within the few seconds available.

Although Colbert testified that he had his flashing lights on, there was no showing whether the engine on the truck was running or not. If the engine was off, there was no showing how long it would take Colbert to start it. If the brakes were set, there was no evidence of how long it would take to release them. There was no evidence of the gear the truck was in or how many seconds it would take Colbert to put it in forward gear. There was no evidence of how many seconds would have been required to move the truck off the road and out of plaintiff's path after the engine was started and the truck was in forward gear.

This court holds that the evidence was insufficient to support the lookout submission contained in Instruction 10. Another of plaintiff's instructions directed to the counterclaim was similarly defective.

The judgment is reversed and the cause remanded for a new trial on all issues. It is so ordered.

MAUS and MONTGOMERY, JJ., concur.